The third case for argument is Elias Gipp, et al. v. United States. Good morning, judges. I'm honored to be here before this court and I'm honored to be here on behalf of Ryan Gipp's three children. Our Supreme Court has held that when considering a summary judgment motion by a defendant, the trial court must adopt the plaintiff's version of events. The plaintiff's version of events in this case is that Ryan Gipp never posed any immediate significant threat to the safety of the officers who first tasered him, then fatally shot him six to ten times. He posed a threat to neither officer. And if Ryan never posed any such threat, it was objectively unreasonable for Webb to taser or to shoot him. We need a trial to determine whether Ryan posed such a threat. Summary judgment was wrongly granted in this case and we're here to ask this court to overturn it. The law requires that such a question as to whether Webb's conduct was unreasonable under the facts must be decided in the courtroom, not on a paper record in the judge's chambers where no one can assess the credibility of witnesses or make reasonable inferences from that courtroom evidence. A version of events is not, as the defense claims, speculation or wishful thinking. We have competent evidence discarded by the trial court by which a reasonable fact finder could find our version as the truth. And we have reasonable inferences from that evidence which our jurisprudence says the trial court must consider on summary judgment, but which the trial court here refused. Counsel, I just have a preliminary question that I find very confusing about this case and hopefully you can help me. Why are we talking about excessive force? This is not a Fourth Amendment case. This is a Federal Tort Claims Act and the district court order was just replete with references to excessive force and very few references, if any, to North Dakota State law. And so I'm just trying to figure out exactly why the — it seems the party stipulated maybe, but why there was a stipulation as to this. Yeah. The phrase excessive force really in this case is, I think, the wrong phrase. It should be unreasonable force, okay? Graham requires that the force be no greater than the threat. But as to your point about the Fourth Amendment, it is the law of North Dakota that this is a defense under North Dakota law to the wrongful death of Ryan Giff if the conduct of the officer in tasering or in shooting Ryan Giff was objectively reasonable. And does the — do state courts in North Dakota look to Federal courts? That's foreign to me, having sat on a State Supreme Court, but it's possible. They have. Okay. They've said that and that's why we're here on essentially a Federal court analysis of an FDCA case because it is indeed a defense under North Dakota law if — and we dispute this — if the officer's conduct was objectively reasonable either in the tasering or the fatal shooting of Ryan Giff. I was talking about our evidence. We have Webb admitting under oath that in no time during the entire sequence from pulling over the Giff vehicle to fatally shooting Ryan, did he ever think Ryan was going to shoot him. The other officer, Sandland, agreed and went even further, testifying that at no time during the entire sequence did he believe Ryan posed any threat to the safety of the two officers whatsoever. We have video evidence, three cameras, which shows much of the sequence — not all of it — but shows much of the sequence in which a reasonable fact finder could find in no way shows Ryan Giff as a threat. We have audio evidence demonstrating that Webb fired the first of his 17 AR-15 rounds an instant after telling Ryan, show me your fucking hands. We have evidence, photographic and testimonial, confirming that Ryan possessed no weapon. We have evidence, photographic and testimonial, from which a reasonable fact finder could conclude there was nothing found on the ground after that fatal shooting which an objectively reasonable officer could mistake for a gun. Wasn't there a — I think there was a shotgun shell or some sort of shell and then a wrench and I don't know how far away they were, but the wrench would seem to me to be something you could mistake for a gun if it's black and shiny. And the wrench was found — And didn't they also testify, if I can add to that, that at that point they did feel threatened? I mean, you made this blanket statement that they testified that at no point did they feel threatened. I don't think that's true at all. Well, I think Webb contradicted himself in such testimony, but that's for a fact finder in the courtroom to decide which of those is the truth. And to your question, Judge Strauss, the AR wrench was not found on the ground after the shooting. As one would expect, if it was drawn and then he was shot and his wrist was blown out, it would be found on the ground and not in a pocket. The defendants, the veracity of what Webb uses as his excuse for shooting Ryan would depend on Ryan taking out this AR wrench out of his pocket and, as he's being withriddled, place it back in his pocket. Well, if they saw something black and shiny, which I think was the testimony, and it was in his pocket, doesn't that arguably make it even more reasonable to feel threatened? People can, in a hoodie, could, you know, certainly if there's a gun in your pocket, lift it and shoot somebody. So I'm just trying to figure out how that helps you. Where the district court went wrong here, Judge Strauss, is in crediting Webb's testimony that that's what happened. We have substantial evidence that none of that happened, okay? What is that? Well, the evidence that at the scene, after Ryan was shot, fatally shot, 17 rounds hit him 6 to 10 times, that this alleged gun that got pulled out of Ryan's hoodie was found back in his hoodie. A reasonable fact finder could say that's implausible. That shouldn't be back in his hoodie. It should be on the ground. Your expert at most said that it suggests that he didn't pull it, right? That's the term your expert used. Right. Okay. Is that enough? Sure. Yeah, because we've got to decide. Okay. But here. And you can enlighten me as to what the officer testified.  If the officer testified that it's hovering above his head and it's way out of his pocket, then maybe it does suggest that. But if he says he pulled it two inches out and he gets shot, I don't know that it's enough to say it suggests that it was never pulled, that it ended up back in his hoodie. I understand the trial court's and this court's temptation to accept Webb's version of events. But we're here because the law says the jury's entitled to consider, the fact finder here, it's an FTCA case, it'll be the trial judge and not a jury. But the law says that the claim by the officer of him pulling a gun has to be tested against the other evidence in court, okay? And where there is any evidence that would contradict Officer Webb's version of the events, it should be played out in a courtroom and not in chambers. Is it sufficient that he, to create a question of fact, that the wrench was later found in the hoodie? That's sufficient to rate it a fact question? Absolutely. You might be right. Is there a case that would be helpful in that regard? Well, one of the problems with the cases, in all these types of cases, Your Honors, we're all looking for cases that are just like it. And they don't exist. It's pretty fact specific. It's pretty fact specific. In the case that you were the author on, Judge, the Sanders versus Newton case, just from this September, there was an armed man and that plaintiff got the district court to say, there's a case here, potentially. And we're on the opposite end because our district court has said there's no case here. But we're not saying that there's never, it's never reasonable for an officer, objectively reasonable, to shoot a suspect who maybe has a weapon. Okay? But you have to test the circumstances of that particular case as to whether it's objectively reasonable. And you can't grant summary judgment if there's evidence to contradict that is inconsistent with the officer's version of events. That's like the Capps case where there was, that's the Driftwood case, where the officer said, well, I think he had this Driftwood and I thought it was a knife. And they said, hey, that needs to be tested in the courtroom. That's our basic pitch. What about the bizarre behavior? It actually, as I was reading it, it led me to say, was this guy on controlled substances? Any kind of, was he drunk, et cetera? Turns out he was. The officers didn't know that, but there was some very bizarre behavior. Like instead of surrendering, going and hiding behind a car and peeking around as if getting in, you know, getting into a stance to potentially fight, all of that would seem to be relevant in dealing with the suspect. And I think all of that is uncontroverted, unlike the wrench. Well, I don't know which, whether to say that all of that is uncontroverted. I disagree with that statement, respectively, Judge. Sure. Tell me, tell me, tell me what was wrong about that. Here's the thing. The district court did not even credit the testimony of Brian's mother, who was handcuffed in the back of the lead squad and who testified Brian was scared of police and he was confused. We don't know exactly what those officers were yelling at him because, well, his dash cam wasn't working that day, okay? So we don't have audio from the front squad. And what they were yelling at Brian from the front of that squad is not recorded. All we have is what the officers were saying. But we have testimony from the mother who was there at the front squad and heard two officers yelling inconsistent commands and saying Brian was confused and Brian was scared. That could account for that odd behavior. It's an overstatement, I think, Judge Strauss, to conclude he was on something, okay? He had small traces of controlled substances in his system. But you would think if that was an issue in this case, we would have had a toxicology report from the defense saying the guy was high. We didn't get that. And so Brian may not have been the brightest person in the world and maybe he was scared that night and we know he was confused, okay? So and then as to your point, Judge Strauss, about, you know, getting behind the pickup and peeking. We'll talk more about that later as I talk about the timeline. I'm running out of time. But I don't think that's odd at all because after he was tased, if you look at the video, it looks like he was fearing for his life. He'd just been tased twice for, taking it from his perspective, no good reason. Why did they do that? It was Officer Webb who escalated the situation and sent him running. And then he took cover behind the pickup of the second squad. That's a fair reading of the version of events and that's a fair reading of the videotape. And a fair reading of the videotape includes that at no time was he ever threatening to the officers. I'm already well past the time I had hoped to get to my argument. I am going to reserve the balance. Thanks very much.  May it please the Court, Sigmund Fuchs on behalf of the United States. I'm also really sick so I apologize for my voice today. I want to begin with just a little bit of a recap of what these officers faced that night. And I think that gets towards Judge Strauss' questions. So Officer Webb reasonably believed Gip was armed with a gun. He reasonably believed Gip had shot at somebody that night because of information he heard over dispatch. And so this already becomes a high-risk, high-encounter for this officer. Then when he approaches, first encounters Ryan, we see a lot of odd behavior. He refuses to get out of the vehicle for over two minutes. So an officer is wondering, what's he doing in there? Is he preparing a weapon? What's going on? When he eventually leaves the vehicle, he doesn't turn around and put his hands up as instructed and walks backwards, which is the safest way to secure an individual who you think has a gun. He's repeatedly putting his hands in his pocket when he's instructed not to do so. He picks up the keys, walks back to the vehicle, and opens up the car door. Then turns around, takes a couple steps back towards the officers, then starts to advance on the officers. And as he's getting closer, this situation is becoming more dangerous as he's closing in. And at that time, he's being instructed to get on the ground, and he's not doing it. When they try to approach him, he takes a bladed stance. He flees in unsuccessful tasing. He then tries to get into the police vehicle. You hear that on the video. Then runs behind the vehicle, where he now has a tactical advantage over the officers. It's undisputed. He then does two quick peeks at Officer Sandlin, which to Officer Webb, appears like this might be a potential ambush, and then rapidly makes a gesture, pulling something out of his pocket. And I think based on the totality of those circumstances, this was fast-paced. It was rapidly evolving. These officers had seconds to decide how they were going to respond to a potential deadly threat. And I think for all of these reasons, the district court got it right that both of the tasing and the use of deadly force was reasonable. I want to respond to plaintiff's argument that both officers perceived no threat that night. I think that's a misread of the record in the deposition testimony. So Officer Webb, and they make this point in the reply brief a couple times, and they say, this deposition testimony requires reversal. Officer Webb is asked if anybody did anything that night to lead them to believe they were going to shoot him. And after some objections, he says, no, not that I recall. They omit the very next question is, did anyone do anything that night to lead you to believe they were going to shoot somebody other than him? And he says, yes. Because remember, there's another officer on the scene. And both with the tasing and the shooting, Officer Webb testified he was primarily concerned for the safety of his fellow officer. He thought this was going to be an ambush on Officer Sandlin. They also say that Officer Sandlin testifies that he did not feel threatened at all that night. And again, there's confusion there because the very next question, the question led Officer Sandlin to not understand if that meant a verbal threat or a physical threat. So then plaintiff's counsel clarifies, did you feel threatened in any way? And he says, yes. And so I think plaintiffs sort of, in both instances, to cite those first lines of testimony doesn't give this Court the complete picture. But they clearly have the guns drawn, so they feel threatened. When Officer Sandlin tries to approach Ryan Gipp, he asks Officer Webb to cover him. So he clearly feels threatened. I don't think there's any question that the officers felt threatened that night. Plaintiff argues that maybe Ryan Gipp was confused. I think this Court, in a case, Neal v. Fecadenti, said it doesn't matter if the individual may or may not have been confused. They're intensely relevant. An officer is willing, is allowed to presume that his instructions are being understood. And when they're not being followed, that there's a reason for that and the fear that it might be nefarious. And now when we look at the tasing, which we don't really talk much about that, and so I won't spend too much time here, but to Judge Grunder's point in the other case, everything leading up to the tasing is on video. I think this Court can review the video, just like the district court, a la Scott v. Harris, and decide for itself, was this a reasonable tasing or not? But I don't think there's anything for a fact finder to resolve with respect to the tasing. And unless the Court has any questions on the tasing, I'm happy to spend my time talking about the shooting. So obviously the shooting is a little more complicated because it happens off camera. So we know, based on Officer Webb's description of events, right, we credit that, that if somebody pulls an object out of the hoodie pocket and they think they're armed and they do an affirmative gesture, that the use of deadly force in response would be reasonable. And so then the burden shifts to plaintiffs to come up with some affirmative evidence, circumstantial or direct, to create a genuine disputed material fact. And I don't think they do that here. What exactly are the details, if they're developed, on this shiny object or this black object? Because it was dark, right? Correct. It was dark. The only light was the illumination off of the police car. And Officer Webb would have been somewhere around like 30 to 40 feet away. So Officer Webb is the one who says he saw the object?  Officer Sandin lost sight of Officer Webb, so he didn't have any sights on him at that time. What are the details? How far did it come out? Was it shiny? What are the details in the testimony, if any? So there's a video that's subject to a joint motion to supplement the record. And in that video, Officer Webb demonstrates the action, and it's really something like this. It's that fast. And he doesn't turn around and point it. It's not up in the air. Nothing like that. It was just a gesture like this, and he sees something black and metal. And that causes him to discharge his firearm. And I think if it was the shotgun shell, that could very easily, from that far away, look like the barrel of a gun. If it was the AR-15 wrench, it could have very easily looked like the butt of a gun. I think what is important... Was there any questioning about was it removed completely from the hoodie? Did it remain partially in the hoodie? Any detail like that that would be helpful? There's no specific question as to how far it came out. All we have is just the visual that his arm came out this way, and he sees something black and metal. And that's it. Counselor, this is Jed Smith. Doesn't that, on the other side's position, that it seems implausible that if something had been removed from the hoodie, and gunshots hit that very hand holding it, that it would seem implausible that that same item would be placed back in the hoodie? So I think what we're playing, I think a little bit fast and loose on this shooting, is we have anywhere between 7 and 11 shots that missed. We don't know when the first shot struck Gip. It's very possible the first, second, third, fourth, fifth shots missed, which is consistent with Officer Webb's story that he thought his first couple of shots were missing and he had to lower his rifle. And so within that first second or two, Ryan Gip could have very easily started to pull something out, see that there's shots coming at him, and put the object back in his pocket before a bullet even strikes him. We don't know. But if you have a weapon that you intend to use for defense, that would seem to be the most logical time to keep it at the ready and not, or even begin to discharge it as opposed to putting it back in a more or less safe position? Well, I think that's just conjecture, but I do think that if he... It is conjecture, but it's the type of factual matter that is appropriate for a trial effect to weigh the possibilities. So again, assuming it's the AR-15 wrench, we don't know. Because if you remember, right after the shooting, Officer Webb, the first thing he says to Ryan Gip, he points to the shotgun shell and he says, is that what you had? Is that what you were pulling out of your pocket? Which I think corroborates that he saw something that he thought was black and metal. And so assuming that it was the shotgun shell, I think the inference is he dropped it while being shot. I think... I mean, we don't know what was going on through Ryan's head. He had some substances in his system. He had a lot of odd behavior that night. But I think it's very reasonable to assume that he pulled something out, the first five or six shots missed, he thinks that's a mistake and puts the object back in his pocket because obviously he can't shoot an AR-15 wrench. But I think the point is, plaintiffs don't know and they are just speculating and I don't think it's a reasonable inference that just because the object's found back in his pocket, we don't know how far it came out. It could have come out, you know, within a couple inches of the pocket and then put back in quickly before a single fire struck him. And plaintiff's expert never opines either way whether or not he thought Ryan Gip was holding anything. He says forensically, it's just inconclusive. So he can't create a genuine dispute on that. Well, he does say it suggests that it wasn't pulled, right? But he doesn't base that off of anything forensic or scientific. He just says he thinks it's odd that someone would pull something out and put it back in the pocket. That's where... And I don't think that that's a credible evidentiary basis or scientific basis to make that conclusion. Yeah. I mean, I guess that seems to be the question on this is, is the fact that it was found later in the pockets create a fact question that a jury ought to decide? That's, you know, versus the officer's testimony that something was pulled. Yeah. And I'll clear up. Obviously, this is going to be a bench trial, not a jury trial because it's an FTCA case. But I mean, Officer Webb doesn't need to know what the object was, right? He just needs to... And he doesn't even need to see a weapon, but he does see something black and metal. We don't know if it's a shotgun shell or if it's an AR-15 wrench, but plaintiffs require a lot of sort of mental gymnastics. Okay, let's assume it was the AR-15 wrench. We don't know. Let's say he gets it all the way out. Let's assume those first couple bullets strike him while he's holding it. And now this then becomes odd that it gets back into his pocket. And they just don't know. And I think it's just speculation. I think what we have is affirmative testimony from the officer that he had a weapon or that he had something black and metal. And we have black and metal objects found on his person, and we have nothing refuting that. I also think if you look at... Because I know, obviously, Officer Webb is the only person that can testify to this because he's the only person that's alive. But I get that this Court then needs to look at the circumstantial evidence to see if it corroborates. And if you look at everything we know forensically and photographically about what happens behind that vehicle, we get nothing but corroboration. So for example, we know when Ryan Gipp is... He's certainly putting his hands in his pocket a lot of times during the encounter. As he runs behind that vehicle, he has his keys in his hands. Those end up in his pocket. So we know at some point behind that vehicle, he goes into his pocket. And then as the District Court notes, items behind that license plate from his pocket are found scattered on the floor, which the District Court said corroborates this notion. He did look like he was manipulating something in his pocket. We know at some point his hand comes out because of the bullet wound to his wrist and there's no corresponding hole to the hoodie. And then Officer Webb says he goes back into, at some point, into his pocket. And we know when Officer Sandlin then gets to the body, he confirms, yeah, he had a hand back in his pocket. And then the first thing Officer Webb says when he gets to Ryan Gipp is, is that what you had in your hand? Is that what you pulled out? So I think if you look at all of this circumstantial evidence, it does nothing but corroborate Officer Webb's story. This would obviously be a very different case if there was nothing black and metal on this person or if his pockets were completely empty. But I think the point is, on the other side, plaintiffs just really have nothing but conjecture. And I think really what this case comes down to is, what's a reasonable inference to draw? And so, for example, I think if you look at this Court's decision in Smith v. City of Memphis to identify this all-weapon, and the plaintiff said, well, he was instructed to get on the ground. And that's an odd instruction to give if you think that somebody is holding a gun. And then wanted this Court to infer from that that maybe they didn't see a gun at all in contradiction to the officer's testimony. And the judge said, no, this Court said, no, that's just speculation and conjecture. I think that's sort of what plaintiffs are doing here. You know, they have a lot of multiple avenues and scenarios of what could have happened in their sort of reimagination. You know, at one point, their expert says, well, if the first couple bullets strike, maybe he was turning away. And that's a contradiction. But if those first couple bullets didn't strike, then maybe when he turned towards Ryan, he was just complying and trying to surrender. But at the end of the day, again, I think it's all just conjecture. I don't think it's something this Court can really reasonably infer anything from. And then I think, you know, for all these reasons, we think the District Court got it right and that this Court should affirm both with respect to the tasing and with respect to the UCW force. One follow-up question. I want to ask you the same question I asked the opposing counsel. This weird thing about North Dakota law, looking at federal law for excessive force, I just want to make sure that the government agrees that that's what North Dakota courts do, because it seems very strange. So, no, and there's not a lot of North Dakota law on this at all. There are a number of statutes that talk about use of force. I know that Judge Treanor in several decisions sort of held that if a use of force is reasonable in the Fourth Amendment, he sees no reason why North Dakota law would disagree with that assessment. I don't have, I believe we don't have a case where the North Dakota Supreme Court has flat out said Fourth Amendment controls. But the general proposition is that the shooting needs to be justified. I think sort of everyone in the United States agrees that as long as it complied with the Fourth Amendment, we think it would comply with North Dakota law in this case. It started out, from what I can tell, as a shortcut where there was both a Fourth Amendment claim and a North Dakota claim. Correct. And Judge Treanor said, well, okay, we're just going to apply that analysis from earlier here too. And now it's sort of morphed into this is now an independent basis of the decision even if we don't have an accompanying Fourth Amendment claim. Maybe the parties stipulated to it, it's probably fine, but it does seem to me to be very strange and questionable. Yeah, no, I mean, we don't take issue with the court employing the Fourth Amendment analysis here. We think that under the Graham factors and the Fourth Amendment jurisprudence, you know, this shooting was entirely reasonable and as was the tasing. And so for all these reasons, we respectfully request that this court affirm the judgment of the district court. Thank you. Thank you, Mr. Fuchs. Thank you. Judge Strauss, first to your point, if North Dakota law were just saying you can't negligently kill someone or taser them, then it would be reasonable care anyway and objectively reasonable would be the way it would be evaluated by the North Dakota courts. The fundamental error, we heard it from this podium just now and we heard it from the district court, is giving way too much credit to Webb's version. Under our case law from the Supreme Court, you have to consider the plaintiff's version and test that without regard to what Webb says as his excuse. His excuse is that a gun was pulled on me or I thought a gun was pulled on me. What if that's not true at all? And we have circumstances. Yeah, okay, that's the key. We have circumstances. Because the plaintiff's not here to testify. So we're entitled as the non-moving party to our version of events with our inculpatory facts and all reasonable inferences drawn there front. And I'm getting to the inferences first. The inference here, why would someone who's been threatened and tased by officers pull a shotgun shell out of his pocket as if to threaten? What the heck is the shotgun shell going to do? How is that going to protect him? Why would he pull a wrench? Those are inferences that the district court disregarded, but that are crucial to the facts of this case. That doesn't matter. What matters is what the officer perceived. But if it didn't happen the way Officer Webb says it did, we get a trial on that. We're supposed to have a trial if it didn't happen that way. And we have facts that suggest it was just the opposite. Ryan approached that pickup. He didn't kick. He didn't yell. He didn't say, I'm going to kill you. He didn't get ready to fight. If you look at the videotape, it absolutely, in our view, a reasonable fact finder could look at that and said he was never threatening at the front of the pickup. So why would he get to the back of the pickup and pull a shotgun shell as if to protect himself or pull a seven-inch black piece of wrench and then put it back in his pocket when he's shooting, when he's being shot? And that's the fundamental error here. The standard that the district court applied was to accept all exculpatory evidence and ignore all inculpatory evidence and inferences. And the Gibbs children are entitled to a new trial. Thank you. Thank you, Mr. Conlon. Court appreciates your appearance, and Mr. Fuchs as well. Case is submitted, and we will issue an opinion in due course.